May it please the Court, Phil Talmadge and Peter Lonas here representing Mari Daniel, the appellant in this matter. Two men died in this case due to carbon monoxide poisoning generated by Coleman's PowerMate 5045 heater. Nevertheless, Mari Daniel was compelled to try her product liability case against Coleman with her hands tied behind her back due to the District Court's erroneous ruling limiting other similar incident evidence and its harsh discovery sanction excluding her expert witness on her preferred theory of her design defect case. Additionally, the District Court refused to instruct the jury on Coleman's post-manufacturer duty to warn users about carbon monoxide hazards associated with the PowerMate 5045. Mr. Talmadge, what risk did or should the manufacturer have recognized after sale of this device? Which risk was not enunciated on the warnings that the device had? Two things, Your Honor. I think, first of all, you have the fact that there are 60 deaths that have happened since the time of the manufacture of the 5045. You have a series of serious circumstances that provoke the manufacturer's position. So they should change their warning from this device can cause carbon monoxide death to this device really can cause carbon monoxide death. Well, actually, Your Honor, the original warning that we're talking about says as follows. For outdoor or well-ventilated construction use only, never use inside house, camper, tent, vehicle, or other unventilated or enclosed area. That's the supplemental excerpt of Article 804. Never use in an unventilated area. Unventilated area. At some point it says danger of injury or death. No, that's it. That's all it says on the product itself. That's the warning. That's the entire warning on the product itself. So is your point that that warning is insufficient or at ab initio, or I thought your case was only as to post-failure risk. It is, Your Honor. Which is it? It's only the post-manufacture duty to warn. So it was, your position is the warning was adequate as far as when the machine was first made. But with 60 deaths, which you say are attributable to the risk which was warned about, now this warning becomes inadequate, and what makes it inadequate is that they should say in addition to what they did say, and there have been 60 deaths. No. What has to take place, Your Honor, is that the knowledge of the manufacturer is an evolving standard. It's not frozen in time. Yes. The assumption of the district court about Washington product liability law and post-manufacture duty to warn was wrong. It assumed that if you had a time of manufacture warning that was sufficient in and of itself, that that froze the obligation of the manufacturer in time, and it had no further responsibilities, even though its knowledge of the hazard of the product evolved. Well, if the knowledge of the hazard evolves to encompass other risks, that's one thing. If it doesn't evolve as to the risk of death, as the risk of execution by carbon monoxide, I don't get your point. Because, Your Honor, you don't have to, it doesn't simply freeze the responsibility of the manufacturer in time. The assumption here is, and the district court's assumption was, if the time of manufacture warning was sufficient, that's the end of the story. That's not Washington law. The only case that Coleman can cite for that proposition is the Thonjum case, in which there's a passing reference made by the writing judge in that case to the fact that there had been an adequate warning given with respect to the baby walker. And note in that case that the principal concern related to the problems of babies being unpredictable as opposed to the inherent risk in the product itself. Here, you have Coleman having an evolving understanding of the hazards of its heater being used indoors. It had an obligation to do more than give that very minimal warning that you see at Supplemental Excerpt of Record 804. Contrast that warning with the warning that it gave on the Focus 5 heater, another heater. You see that warning being much more specific, specifically referencing CO2 or CO exposure. You see that Focus 5 warning referencing the look of the burner on the device. All of these issues giving further and greater warnings to anyone looking at these kinds of heaters and understanding that they have a problem if they use them in the way that these individuals use this heater. Can I go back to the warning? I have a benchmark here summarizing the warning and citing the Supplemental Excerpt stating on the heater, follow instructions and warnings to avoid fires, serious injury, or death. Correct, Your Honor. You left that out. Well... I said, correct. I asked you and you left it out. No, Your Honor, the specific... Then you gave me the next line. I said, doesn't warn about death and you left it out. Well, the specific... You should apologize for that. I'm sorry, Your Honor, but the specific warning that was given with respect to the exposure to carbon monoxide was for outdoor or well-ventilated construction use. This is on the heater. They're told, use it outside or you may be dead. How specific can you be? Well, the warning that was given was a warning that simply said, never use inside house, camper, tent, vehicle, or other unventilated or enclosed area. It implies that you can use this in a ventilated area. Avoid fires, serious injury, or death for outdoors or well-ventilated areas. Correct, and it implies that you can use the heater in a ventilated area. There's no absolute ban on using this kind of heater indoors as Coleman would have the court believe in its briefing. Well, I think... So, what your position is... You were on the plain text and you didn't read it the first time. Well, I apologize to the court, Your Honor, but the operative warning that was given on the device for outdoor or well-ventilated construction use only, never use inside. What could be more specific? But it doesn't make any mention, Your Honor, of carbon monoxide exposure. It doesn't make any mention of the color of the heater. It doesn't say any... How much of these people don't read these things anyway? They say they don't. Well, in this particular case, we have an individual who indicated that he was well aware of this problem from his service in the United States military in Korea and had avoided the use of these kinds of products indoors. He understood that from his experience. You have the Focus 5 warning that says never use heaters or other fuel-burning products while sleeping, so you have many more specific warnings that were given, and you have in this particular set of circumstance an evolving understanding on Coleman's part as people are dying from the use of these products indoors. Well, if it's that bad, it should be banned. If people don't pay any attention to the warnings, if they're incapable of following warnings, then this is an inherently dangerous object and it should be banned. That's not your position. We argue design defect in this case, Your Honor. We did, in fact, argue both warning under Washington product liability law as well as a design defect theory, and in this particular case... People pay no attention to warning. Well, that's a problem in general, but the Washington law of product liability does specifically require that warnings be given with respect to products that have a hazard, and this is a hazard that Coleman understood it had. And you have a... Read us the applicable provisions of the Washington law. I will, Your Honor. Washington law says a product is not reasonably... This is RCW 7.720301C. A product is not reasonably safe because adequate warnings or instructions were not provided after the product was manufactured where a manufacturer learned or where a reasonably prudent manufacturer should have learned about a danger connected with the product after it was manufactured. In such a case, the manufacturer is under a duty to act with regard to issuing warnings or instructions concerning the danger in the manner that a reasonably prudent manufacturer would act in the same or similar circumstances. So it's a negligence standard. No, it's a strict liability standard, Your Honor. The Washington Supreme Court... What does it mean, or where a reasonably prudent manufacturer... reasonably prudent manufacturer? Doesn't that mean a negligent manufacturer? It would ordinarily, but I have to tell you, Your Honor, that the Washington Supreme Court has taken the language of the Product Liability Act in several circumstances, warning being one and design defect in another, language that speaks to negligence and has held that it's a strict liability standard. With my acquaintance with the Washington Supreme Court, I believe you. The next question I have is this. Doesn't this mean a risk that the manufacturer knew or should have known after the manufacturer, in other words, a new risk, a risk that wasn't advised against by the earlier warning? I don't believe so, Your Honor, and for this reason. First of all, Fanchum is the case that's cited for the proposition that it has to be an entirely new risk. There's a passing reference in the decision to some... the fact that the original warning itself was sufficient, but it's a very passing reference in the opinion. Esparza, the more seminal case involving this issue, again, an intermediate court of appeals decision in Washington, makes no reference to this notion, and I would submit that in the language of the statute, nowhere speaks to the idea that if you have a time of manufacture warning being sufficient, that concludes the evaluation. No, no, we're not saying that, but it concludes the evaluation of the risks which were evaluated at the time of the warning, which continue thereafter. It doesn't end the evaluation as to new or different risks which come up and of which the manufacturer knows, but isn't that the situation we have here? If you warn about carbon monoxide asphyxiation in your original warning, that risk is warned against even after the post-manufacture, even if people start dying. I don't think so, Your Honor, for this reason. I think it would make very poor jurisprudential policy to say that if a manufacturer of a product puts its product in the stream of commerce, even though it originally warned about problems, let's say it specifically warned with respect to carbon monoxide, which it didn't in this case. There's no reference to CO in the original warning here. But let's say that it did, but it generated additional knowledge over a period of time as the product was in the stream of commerce. Things were happening with people using that product. The policy of the Washington Statute, the Restatement III, Section 10, seems to suggest that you have an evolving responsibility as a manufacturer to do more than simply sit on your hands. It isn't enough to say, we warn you that using without the warnings and instructions may lead to death. You have to say, death by carbon monoxide? Well, apparently that's what Coleman thought was appropriate when it gave the post-manufacture warning with respect to its Focus 5 heater. It thought, with respect to that post-manufacture obligation, that it was appropriate to mention specifically CO exposure. It was appropriate to specifically mention, don't use this product when you're sleeping. It was appropriate for them to mention specific aspects of... Was the Focus 5 heater warning given after the manufacture of the 5045? No. It was given after the manufacture of the Focus 5, and it predated the manufacture of the Powermate 5045. So it predated it. They were warning about carbon monoxide on Focus 5 before they manufactured 5045. Correct. And they manufactured 5045 with no mention of carbon monoxide, but the mention of serious injury or death if you use it in a closed area. That's correct. So you're saying that they were on notice that carbon monoxide was a risk which they should specifically have warned against, and that simply warning about death from using in unventilated premises was not sufficient ab initio as a warning, right? Well, we argued that, and the jury disagreed, but we're saying here that with respect to the post-manufacture obligation, given the knowledge that it had, that it had the obligation to add to the warning. Well, if the jury disagreed that they didn't have to warn about carbon monoxide at the time that they made the device when they had warned about carbon monoxide on other devices, why would the jury find differently if they were given a post-sale warning instruction? Well, remember, Your Honor, the district court excluded from evidence the post-manufacture warning with respect to the Focus 5. That was part of the argument that we suggested was an abuse of discretion by the district court here. That and the other similar incidence evidence, only five of the 30 incidents were excluded. Let me ask you this. Did you present evidence that the Focus 5 had warned of carbon monoxide before the warning was put on the 5045? We were prevented from getting into evidence, the evidence relating to the Focus 5 post-manufacture warning. Post-manufacture? Correct. But you didn't offer it for the purpose of showing that the 5045 warning was defective  when the 5045 warning was attached. I think that's correct. All right. I think that's correct. I'll reserve the remainder of my time. Thank you. Well, let me ask you this. Yes, Your Honor. The 5045, that came on the market after the Focus product was already on the market. Correct. Had there been any deaths caused by carbon monoxide to the Focus products? I believe there had. Well, don't you know? I mean, do you believe? My recollection is that there had, Your Honor, yes.  Coleman knew that the Focus products were causing death by carbon monoxide. And there had been a Consumer Product Safety Commission report relating to these various issues. Yeah. And so what warning was on the Focus product when it was first put on the market? I don't... I only have the 5045 warning, Your Honor. I don't have the Focus 5, the original time of manufacture of Focus 5 warning with me. But I can provide that to the Court as a supplemental authority referencing the record. Well, there was a warning that was given on the 5045 when it went on the market. Correct. And then people used that product and were asphyxiated, right? Correct. And you're not saying that the original warning was adequate, are you? With respect to the 5045, Your Honor? Yes. No, we argued that issue to the jury. We said that we believe that the original warning was inadequate. The jury disagreed with us. And the court ruled that the warning that was on the... when the product was originally put on the market, that the manufacturer, the Coleman people, showed that they were aware that there was a problem. Correct. That product. And they took care of it by the warning. That was their argument. And did you argue that because how many people died? Sixteen? Sixty. Sixty. Sixty. Yeah, you have to speak up a little. Sixty. That whatever warning was on there was inadequate? It certainly didn't seem to give notice to people who were using this product, at least those that used it improperly or used it without any understanding of the consequences, that that warning in the marketplace was not an adequate warning. Your Honor, remember in this particular case there were 30 OSI or 30 other similar incident reports that were sought to be introduced into evidence. I know that. Relating to the 625 were excluded. They kept them out. Right. And I don't think that was... I would not have made that ruling. Okay. All right. Here from the other side. Thank you, Your Honor. Good morning, Your Honors. Todd Rosenkranz for the Coleman Company. I want to start out with more of a big picture notion. Let me ask you a question. When Coleman put the 5045 on the market, was Coleman aware that similar products that had been put on the market had resulted in people dying of asphyxiation? Yes, Your Honor, and that's why they put the warning on the product and in the instruction manual. And much of the conversation that you had with Mr. Talmadge up here was simply a rehashing of the decision that the jury made about the warning that was already on the product. There was a lot of discussion at trial about the product needing to have the words carbon monoxide. How many people, if they did, did Coleman figure would die as a result of the use of this product when it first went on the market? How many did they figure would die? Don't they do studies on that? No.  Absolutely not. Absolutely not. Coleman's position was if you use the product as it was intended and in compliance with the instructions and warnings, it was safe to use. And that was what was argued to the jury. Isn't it an inherently dangerous product? It has some inherent dangers, yes, absolutely. Just like a knife, just like a chainsaw, just like anything else. Like a gun, like anything else. Yeah. And couldn't that have been avoided by a proper design? No. And, in fact, that was argued to the jury as well. We have to remember in this case that the plaintiffs received a time-of-sale warning instruction. They received a strict liability design defect warning instruction, both under risk utility and consumer expectations. How did the plaintiffs, how do we know that the people that died knew this? Pardon me? How do we know that the people who died were aware of these risks? Well, in this case, we know that the person who owned the heater, who brought the heater inside the camper and who operated the heater, was fully and completely aware of the risks. In fact, he said in his trial testimony, this is Mr. Haney, that he knew when he brought that heater in the camper that this heater would produce CO in an enclosed space. He knew that. He also was fully aware of the danger. In fact, he said that he read the label on the product. Didn't he provide some ventilation in there? Yes, that's what he said. And now when you take the valve that's on the propane tank, you're supposed to leave that in an open position. That's correct. And not play around with it and lower that position. Now was that valve designed so that it only turned and when it was turned it was in the open position? Yes, Your Honor. And you have to keep in mind that the tank is not a Coleman product and the tank that this product was on was one of the oversized tanks. The whole product and the tank would sit up about this high. It was very large. And it was, I guess, a seven-gallon propane tank. So it was larger than the one you might use in your barbecue grill. And this isn't part of the record, but I know that either it's open or open. But when the product is attached to that tank, where is the valve that opens? Is that on the tank or on the product? Both. There's a valve on the tank, and then there's a control knob on the top of the product itself. On the top of the product. Correct. Okay. So when it's hooked up to the propane tank, there's a valve there that's a Coleman product. Right. On the heater unit itself, on the control panel of the heater unit, there is a knob. Correct. And how does that knob turn? Just in one position, it's always open? No, it has, as designed, it has a series of detents, so you can click through from high to low. It goes click, click, click, click, click. And at the last section, it clicks and springs to the off position. That's the as designed function of that control knob. But as far as the propane is concerned, you want a steady flow, you don't want to mess with that. That's correct. And in this case, Mr. Haney. Is that warning on the product? The instructions for use that are on the label of the product say in two places, open propane tank in one place, and in the second place it says open propane tank fully. That was on the product. And not only that, Mr. Haney testified. Well, does it say why you need to open the propane tank fully? No, it doesn't say that. It doesn't tell him about that. And if you want to control the heat, you control the heat by the valve that's on top of the product. Correct. Does it tell you that that's the way you control the heat? Yes, it does. It's on the, what's it, 50-45? Yes. And are you saying that, let's say the, what do they call the other products? Focus. Right. Had people died of asphyxiation in using the focus heaters before the 50-45 went on the market? I believe that's the case, yes. We know that's the case. Right. Yeah. And was there any warning on the product, 50-45, that warned people that if you play around with that valve that's on top of the tank, that that can result in asphyxiation? Now, are you talking about the... Carbon monoxide? Are you talking about the tank valve, the valve on the propane tank? The valve on the propane tank. Other than saying open the tank fully, no, it did not. Don't tell them that. If you don't, you'll die. But it said if you use it indoors, such as a camper, like in this case here, you will die. But it says if it's, it says that, you will die. Yes. Okay, but it tells you you can use it if you're indoors and it's ventilated. No, it does not. It doesn't say that. It says for outdoor use only. And then this... This is the tank, is that right?  Are you talking now about the tank? No, I'm talking about... About the valve. The tank says that, too. That's correct. But I'm talking about the on-product warning. It says never use inside a camper or you will die. It says death. And what we're talking about now is really going over... We know, we know, at least I know, that I'm sure you know, people know, that a lot of folks have passed died of asphyxiation. You read about it all the time when you go into some old motel and you turn up the gas heater and it's not properly ventilated. People die. It's been going on for a hundred years. Why would... I don't understand why Coleman would put a product like that on the market to begin with. Because in my mind, Coleman is an excellent company. You can buy their stoves. You can buy other equipment they sell. They even sell T-shirts now. And so you say this is a good, reliable company. I don't think they're going to put anything on the market that's going to cause me to die. So why would they put that out anyway to begin with? Well, Your Honor, because... It's got to have a big red tag warning on it. Because, Your Honor, it's a safe product if used properly. And everything that you're saying right now... We see that a lot of people haven't been using it the way Coleman wanted them to use, and it's resulted in a lot of deaths. But if you had that involving an automobile, wouldn't you have a big recall on the cars? Absolutely not. You don't think so? No. And everything that you're saying is precisely what the plaintiffs... If you know the brakes didn't work on a car, you wouldn't have a recall on them. The plaintiff's steering wheel would fall off. You wouldn't have a recall on them. Well, by analogy, the brakes worked, the steering wheel worked. It worked precisely as it was intended. And it's an inherent physical fact of combustion that if you have a fuel-burning device, it doesn't matter what it is. If you use it indoors in an unventilated area, it's going to produce CO. And that was the risk versus the utility that was argued at length to the jury for 11 days. And the ground we're covering now is actually... Yeah, but the jury didn't have all the evidence, did it? No, that's incorrect. Well, the jury didn't have evidence of these other heaters, focus heaters, that created a problem that resulted in death. Well, let me address that in a couple... I mean, did they have that? The Focus 5. That was kept out. That's correct. Yeah. And what's the basic difference between the two heaters? They both have that upper valve and they both have that lower valve. No, that's incorrect, Your Honor. It's incorrect. Yes. And let me break it down this way. The Focus 5 heater is a small heater that runs off a one-pound cylinder, like you buy at the grocery store. It does not have an adjustable valve on the propane supply, number one. Number two, it's intended for indoor use. It's intended for use inside tents. Number three, it's nine times smaller. That's because the valve is not adjustable. It's because the valve is not adjustable and because it's a very small heater. It's intended for indoor use. But you can die in 30 seconds with carbon monoxide. And they have ventilation instructions that go. It's a completely different product. They have ventilation instructions. And let me go to the point about the idea that there was knowledge that evolved over time. Well, it was the plane of strategy at trial to argue that Coleman had all this knowledge before the 5045 was manufactured. They put on evidence of other incidents. Even though the judge kept out many other incidents, the judge said, I'm not going to sanitize the record. And so she let in copious amounts of other incident evidence to go with notice. When the plaintiffs cross-examined a senior VP of engineering at Coleman, they took a big white poster board, and they wrote up every first incident for six different models from 1992 to 2005. They had their design experts say, I looked at CPSC records, and there were 49 reported to CPSC. Most of them were Coleman products. They made reference to incidents up and down the entire trial record. And another thing to keep in mind, and we cite this in our brief, the elephant in the room here on other incidents is that none of them were in admissible form. And there's a stunning point. They were in what form? Admissible form. None of the other incidents were in admissible form. And we quote this. Inadmissible? Do you want to tell us? Yeah, there were multiple levels of unredeemed hearsay. I mean, what they did for these other incidents, they compiled a folder on each incident. They had like 30 folders. But it really was a hodgepodge of information. There was deposition notices in there. There was depositions. There were complaints. There were verdict forms. And the judge took all of that stuff home with her and spent an entire weekend going over it. And she said, never in the whole time I've been on the bench has anyone proposed exhibits to the court that contain documents that were so obviously not admissible. And it was frustrating because I spent all weekend doing it. Okay, that was the other incidents. Well, frustration goes with the job, you understand. Well, right, absolutely. But where are those other incidents here for this panel? What were those other incidents? Did you have some police reports that were in there? There was all kinds of stuff in there. What was in there? Well, you'd have to look at it. There was police reports. There was coroner's reports. There was legal complaints. Sometimes there was discovery. Why were they inadmissible? Coroner's reports are the official document. Because the way they were presented, they were presented as an amalgam. Because they were presented stupidly. Is that what you're saying? Well, I'm not here to make judgments about that. But they weren't presented as one report at a time. They were presented as an amalgam of stuff altogether. Police report. The police goes out and they interview someone and say and then they recount what the person said. Let me ask you a question. Is there an issue preserved on appeal that the court incorrectly ruled that the foundational requirements as to those exhibits was lacking? That the judge was incorrect on that? No. We argue that as a. . . I want something else. Okay. Like, for instance, the discovery abuse. I haven't heard yet any argument. Maybe we'll hear some from plaintiffs. Well, I thought there was an argument in the briefs. But if there's something admissible there, I would think that the judge would say to these lawyers, apparently that they don't know what they're doing, look, you've got some stuff here that may be admissible and there's stuff that may not be admissible. So get rid of this. Listen, let's see what I do. Well, she did do that. She gave them a chance to go back and resubmit it. They didn't do it. And even the incidents that she allowed in on the 5045, they didn't have it in admissible form. They had their experts sit there and read the files on his lab, and those never got admitted. And I think that's a pretty broad latitude that she allowed for that to happen. She didn't allow an expert to testify. Why? That's incorrect. She allowed all the experts to testify. And specifically with Mr. Hutter, his exclusion, the exclusion at issue there was very, very narrow. All she did was exclude one late test that occurred a couple of days before the disclosures, one test and the testimony surrounding that test. He had two prior lengthy reports, and he was allowed to testify about that. So he was not excluded at all. And when you look at that, you – So you had a late-blooming theory from late-blooming experts. That's correct. Yeah, but that happens a lot in trials, doesn't it? Well, not in my experience it doesn't. Well, okay. And especially not when you change horses from design defect to a manufacturing defect that was never pled, never surfaced in discovery until an interrogatory answer. Well, they're pretty close, you know, design defect and the other one. Manufacturing defect, you know, they're just a horse of a different color. Well, not as applied in this particular instance. It couldn't be more different. I'm well past my time. No, that's all right. Now, what about the fact that she wouldn't allow this supplemental report to come in? Granted, the discovery had closed. You still, you know, disclosure of expert reports still had six days. But then there was a six-month continuance, wasn't there? Six-month continuance. No, there was a less-than-three-months continuance from March to June. What I read was the trial was continued for six months. That is incorrect. It was less than three. The original trial date was March 31st. The trial actually occurred on June 9th. And this is why. Well, when the judge denied the motion to introduce this supplemental report, wasn't the trial continued shortly thereafter for six months? No. It was continued but only for less than three months. Did the plaintiff renew his motion to admit the late-blooming expert after the trial was continued? Yes, they did. And did the judge rule again? Yes, and it was denied. And what was the claim of abuse of discretion in that determination? What is their claim of abuse of discretion? Well, their claim of abuse of discretion was I have a hard time getting my arms around it. They say it was harmless to Coleman because there was this gap to trial and then a little extra time added before trial. So Coleman could have gotten an expert to come up against the new late-blooming view? That's their view. That's an incorrect, however, analysis of whether it's harmless or not. And there are two cases that are cited in the briefs, one the plaintiff's cite, one that we cite. One is called the Wong case and one is called the Hoffman case. And those cases say that if you have to reopen discovery or redo summary judgment briefing that's already been submitted, that is not harmless. Another case that Counsel for Daniel submitted to this court by a letter submission is called the Luke case. It's unpublished, but it came in by letter. And that case was just like ours. That was a case where an expert came up with a new theory in response to summary judgment at the close of discovery. And the Ninth Circuit panel in that case said if you come up with a new theory at the end, that is not harmless. So the analysis isn't could Coleman have scrambled and got a new expert. That's not the analysis. The analysis is this court has already held that it's not harmless if it's a new theory. And the plaintiffs undersell the extent to which discovery would have. Why is it a new theory between a design defect and a manufacturing defect? This goes back to when I was talking about the control knob on the top of the heater has a series of detents. A detent is a catch. So it clicks through its range of travel. Click, click, click, click, click. And at the very end, it springs to the off position. And the reason for that, the reason it springs to the off position is because if you get it on a restricted fuel flow, you know, somewhere between low and off where there's barely a trickle of propane, that can increase carbon monoxide production. And it was the plaintiff's trial strategy to show that this was known since the 80s. And they got that into evidence and they argued that. Okay? So what Mr. Hutter said is that in this late test, he was able to overcome. He said all the detents were missing. And so he was able to get it in an artificially restricted fuel flow level just by using the knob on the heater. That would mean those detents were gone. How is that a manufacturing defect? There's no – it's not broken. He can manipulate it, but it's a design defect. No, because that's how – as designed has the detents in place. So if they were missing, either they were – it didn't conform to the design spec or something happened after it was in service or something happened even after the litigation started. Okay? And so what you'd have to do, you'd have to completely redo discovery. We'd have to tear down the unit, see if they were really missing, what was wrong with it. You'd have to redepose the experts because all the expert reports, all the expert depositions were premised on the theory that Mr. Haney restricted the flow on the tank valve itself, which he said he didn't do. And there's a serious issue of spoliation because the plaintiff's expert ran the subject heater in two enclosed spaces and got very high temperatures. So that raises the question, well, maybe those detents melted in the high temperatures. It got so hot in that camper during their test that it melted a grill up above and a hand crank. So if we were going to allow that theory, we'd have to start over from scratch. And that is not harmless. You're way over your time. All right. You know, this is a – we put 15 minutes on a case like this. This is an important case. It's a case that involves death. And so sometimes our – I think, my colleagues may not agree with me, that these strict time limits should be guidelines like sentencing, you know. Thank you, Your Honor. The parties appreciate it. Ms. Daniels here, and we struggled with the same kind of issue when I was on the Washington Supreme Court, but I believe that the additional time for argument is definitely appropriate here. Let me make three very quick points. The first is that I would invite the Court to take a look at the warnings that are at issue here, the warnings that we've spoken about. The warning with respect to the 5045, which is at SCR 804, that's the warning that Judge Noonan and I had a conversation about. But it does indicate that – Where's that again? That's at SCR 804, Your Honor. It does indicate that for outdoor or well-ventilated construction use, only never use inside or – and it describes campers, houses, and so forth, and other unventilated use. So it seems to suggest that ventilated use is appropriate. And Coleman now suggests that it never should be used indoors. If it had meant that, it should have said that, but its evolving knowledge suggested that it was having problems with all of these products that had a CO generation capacity. But a very different sort of thing the focus was. What was the use of having all that stuff on the focus? Well, we were talking about the Focus 5, but it also involved the Focus 10, which was a bit larger machine, and there were other PowerMate machines, too, Your Honor, as well. So we're talking about a whole family of products. Do you want to explain how the evidence really was admissible? The evidence that we're talking about? The evidence really wasn't admissible. Well, that wasn't the basis for the district court's exclusion of the evidence. Well, how is the issue raised? Yeah, he's raised it, but, I mean, the evidence is there. As Judge Pregerson suggested, there were police reports that were a variety of folders that were provided to the district court, and contained in those folders was evidence of the fact that there were other similar incidents that involved people dying, people being injured by CO2 exposure. Let me see if I can focus your attention on this. Correct, Your Honor. The exhibits were marked for identification. They were offered. The judge took them home, read them over, came back and said, foundationally, they're not adequate. I don't think she did that. I don't think she found that it was foundationally inadequate, Your Honor. She excluded them because she didn't believe that the evidence relating to these other machines was sufficiently similar to the PowerMate 5045 to allow it to be admitted as evidence. That goes to relevancy. The question as to foundation and introduction of foundation, is it your position that she made no ruling regarding their inadmissibility because of lack of foundation? That's our position, Your Honor. All right. Contrast that warning with the warning that was on the Focus 5, Focus 10, and that's at SCR 1297. Much more detailed, much more specific, much more of a reference to CO use, much more of a reference to the use, the visual of the burner on the machine. All of these things gave people greater opportunity to warn, greater opportunity to understand. Counsel has suggested that there's a causation issue. Again, I'd point out if Coleman thought that there was such a causation problem here, Coleman spent an awful lot of money advertising in various magazines involving hunters, RV users, other people who use these devices recreationally. Basically taking out ads with this revised warning in them, and that's part of the record in this case. So you have an indication from Coleman that it thought it was going to reach people like Mr. Miske, Mr. Daniel, and the others that have been affected by these kinds of products. So the warning issue, I think, is one that's significant under Washington law by virtue of the language of the statute, by virtue of the case law, certainly by appropriate authorities like the restatement third, looking at this concept of post-manufactured duty to warn, to argue that it freezes in time I think is a poor jurisprudential policy. The manufacturer gains additional knowledge. It's in the best position to take that knowledge and use it to warn consumers about risks that emerge, even if they're slight variations on existing risks. When you have something as profound as 60 deaths, you have to take more steps than simply sitting on your hands, and that's what's at issue here. The second issue is the other similar incidents evidence that we've spoken about. Judge Bea asked me the question about foundation evidence, but I would point out that the trial court here, I think, specifically ruled on the basis of lack of substantial similarity. The trial court was under the impression, I believe, that you had to have virtually identical products before the other similar incident evidence could come in. It's contrary to two decisions of good trial judges, one in the Eastern District of Wisconsin, one in the Western District of Washington, both involving these very products. You have the CO case, you have the Van Denning case, where the trial courts in those cases specifically ruled that the other similar incidents evidence involving this family of heaters was really a kind of discretionary judgment. The judge on the spot makes the decision. It could go one way or the other. It could be, Your Honor, but if the judge was applying the incorrect standard, this court in Cooper said it isn't identity that's required, it's substantial similarity. It would be like arguing that if you had... Those certainly didn't sound substantially similar to me, if they were small to be used specifically in a camper. The judges in those cases that I referenced in CO and Van Denning both said no technical difference. It's hard, anyway, to see as a matter of law. No technical difference, Your Honor, whatsoever, between the various focus machines and the PowerMate machines that we're talking about. No technical difference whatsoever, and if there's no technical difference, as a matter of law, they're substantially similar and the evidence should come in. The third thing is the question of the discovery sanction. Contrary to counsel's argument that the exclusion of the supplemental report of Mr. Hutter was very, very narrow, it essentially gutted the case that Daniel intended to provide with respect to the use of the PowerMate 5045 in the low, in the starved-to-fuel setting. It was based on the knob. That section under which receipt was denied of that supplemental report, certainly the judge has the power to point to that section and keep that out, but that section also provides alternative sanctions that are much less onerous, and did you argue for those? We did, Your Honor. We suggested that there were many options here that the district court could have employed, and, in fact, the rule itself contemplates two specific exceptions. One is harmlessness and one is substantial justification. The harmlessness argument here goes to the fact that there was a continuance of the trial date. How long was that continued? It was continued until June, and the decision, the report was submitted in late November of 2006, so it was a period of about seven months before trial that the report was in, and there was plenty of opportunity for discovery to be had. There was more than enough opportunity here to chase down the issue and deal with the issue appropriately on the merits. But I would point out there was also an issue of substantial justification, as noted in our brief. Mr. Haney, who was one of the three hunters who was at issue in the case, Mr. Haney was in service in Iraq. The problem that everybody had was nobody believed Mr. Haney's original assertion about how the circumstances of the accident took place. They believed that he was affected by CO, and they didn't think that his explanation made any sense until Mr. Hutter had a chance to sit down with Mr. Haney when he was back from Iraq and had an opportunity to discuss within the circumstances under which the accident occurred, and then Mr. Hutter went out and tested it according to what Mr. Haney had told him and discovered indeed that his description of the control knob basis for operation of the Power Mate 5045 in the fuel-starved mode was as he said. That was the knob at the bottom, was it? I believe it was the knob at the top. It's the knob at the top. The one at the bottom is the fuel valve. Haney's version of how he used the knob was consistent. He was consistent, but people didn't believe. They thought he was affected by CO exposure. Haney didn't use the one at the top. He was talking about the one at the bottom, wasn't he? No, he was talking about using the control knob, not the valve. The control knob. Correct. The little one on the top. Correct. That was the basis for it being operated in the fuel-starved position and generating a considerable amount of CO. Was the valve at the bottom open? It was. All the way? That was my understanding, yes. The point here is this was just a different way of explaining the design defect in the case. It was something that was a video that showed this operation in this fashion. This was a different way of explaining it. The district court had given plenty of time for the parties to work through the issue. There was plenty of opportunity for Coleman to defend the issue. There was substantial justification for the issue. I note that district courts do have discretion under the standard that's been set up in Mali by Yeti. I would also submit that the wander and went factors that look to a less drastic sanction than excluding a witness, particularly excluding a witness that kills a theory of the case, borders on due process issues. And the rule contemplates a severe sanction in order to deter people from doing the kinds of things that were done in Ortiz Lopez and Mali by Yeti where there was an egregious abuse of the discovery process. Here there was a very legitimate explanation as to what took place. There was relatively little harm, if at all, to the defendant here. You had plenty of time in which to treat the issue. And the opportunity for this evidence to come in, it should have come in to allow Ms. Daniel to present her product liability case fairly to the jury. She was deprived of that opportunity. Compounded by the fact that she didn't get an instruction on post-manufacture duty to warn, compounded by the fact that the post-manufacture warning on the FOCUS 5, FOCUS 10 didn't come in, compounded by the fact that the other similar incidence evidence did not come in, her hands were tied behind her back. She deserves a new trial, and we would hope that the court would so order. Thank you. In fairness to counsel, you want to say something? All right, but I'm running things. So if you want to say something, go ahead and say it. Let me just get this out. Mr. Talmadge said that this exclusion of the expert killed the theory. It didn't kill a theory at all, because they still had Mr. Engberg, a design expert, testify over the course of two days. He gave testimony about two different alternative designs. He talked at length about if you run it in a fuel-starved setting, it's dangerous. Mr. Hutter, whose test was excluded, nevertheless got up and said, if you run it on a fuel-starved setting in the way that it looked, as Mr. Haney described, it produces all kinds of carbon monoxide. It goes haywire. So they put on a full case about design and warnings, and on the warnings, this notion about the evolving standard, they put in evidence from the 80s and the 90s, before it was manufactured, of tests Coleman ran in a fuel-starved mode that increased CO production. That's nothing extraordinary. It's just a fact of science. They took all that with their warnings expert, synthesized it, and said the point-of-sale warning was defective because it should have had a reduced fuel flow warning. It should have had a burner screen warning. That all went to the jury, and the jury decided against them. So the post-sale warning didn't break any new ground at all. It would have been the same evidence, and really what they wanted was two instructions and two chances on the verdict form for the jury. But all of this that we've been talking about today, the jury has already decided after a full and fair trial. Can I ask you about the exclusion of the expert and justification? Was that a justification Mr. Haney had been in Iraq? No, it was not. And for these reasons, number one, the plaintiffs and their expert had the heater itself for more than a year. Mr. Engberg ran tests on it on two separate occasions, including a test in the camper itself with the tank valve wide open and the control knob on low, just like Mr. Haney said. So they had the opportunity to observe the function of the control knob for more than a year, and they didn't discover it. And that's why you raise a suspicion of post-litigation spoliation or change of condition. Number two, Mr. Haney's litigation what? Change of condition. They used the word with an S. Oh, spoliation, spoliation of it. Okay. I mean, it raises the – he ran a test in January of 2006. What do you mean? They tampered with the evidence? Well, not intentionally, but that there was alteration of its intended function because of the high heat generated during litigation testing. And you were going to say Mr. Haney and what? Mr. Haney testified at trial via video. So they had an ability to contact him to set that up. Surely they had the ability to speak with him during his deployment because they were able to get him to testify in front of a web camera and by phone. So that certainly suggests that he was not completely and utterly unavailable. So he testified in the trial in front of a rack? Correct. But how about this business of the black versus the orange on the device? I'm not sure I understand the question. Well, didn't Haney say that he remembered that the – what's that heating element called again? Yeah, the burner screen, correct. The burner screen was black. That's what he said. And that goes to my point that this was argued, this all was part of what was argued at trial and what the jury considered and rejected and found in Coleman's favor. Haney gave that testimony. The experts at trial were allowed to say the way Haney described it, the burner screen meant it was running on a reduced fuel or fuel-starved mode. They argued that to the jury, and the jury rejected that and found in Coleman's favor. So there was nothing that they were not permitted to argue. You're saying that all that expert testimony, all that stuff that the judge kept out, came in anyway. Well, just not – yes, in essence, absolutely, it came in anyway because they took his description of how it worked, how it looked, and they said, aha, that's fuel-starved mode. That's dangerous. You should have had these changes on it, and the jury considered that within the context of the design defect instruction, and they said no defect. So it all was argued. It all came in, in essence, and was argued before the jury. Was Mr. Haney related to the two victims? By marriage, yes. Yeah. Well, you know, he must be gone through hell himself. Yeah. All right. Thanks.
judges: Pregerson, Noonan, Bea